

**RECEIVED**
12/9/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## United States District Court
### for the Northern District of Illinois
### Eastern Division

| | |
|---|---|
| Leah Levinger, Plaintiff | Case No. 1:20-cv-07292 |
| v. | Jury Trial: ☒ Yes ☐ No |
| Claudia Morell, Defendant | JUDGE DOW JR. |
| Maria Zamudio, Defendant | MAGISTRATE JUDGE FUENTES |
| Alex Keefe, Defendant | |
| WBEZ, aka Chicago Public Media, Inc., Defendant | |

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

**A. The Plaintiff**

Name: Leah Levinger
Street Address: 95 Fountain Road # 3154
City and County: City of New Haven, County of New Haven
State and Zip Code: Connecticut 06515
Telephone Number: 773-787-6875
E-mail Address: thisday.is.what.is@gmail.com

**B. The Defendants**

*Defendant No. 1*

Name: Claudia Morrell

1

|   |   |
|---|---|
| Job Title | Reporter for WBEZ Chicago |
| Street Address | Chicago Public Media, 848 E. Grand Ave., Navy Pier |
| City and County | City of Chicago, County of Cook |
| State and Zip Code | Illinois 60611 |
| Telephone Number | 415-846-7173 |
| E-mail Address | cmorell@wbez.org |

*Defendant No. 2*

|   |   |
|---|---|
| Name | Maria Zamudio |
| Job Title | Reporter for WBEZ Chicago |
| Street Address | Chicago Public Media, 848 E. Grand Ave., Navy Pier |
| City and County | City of Chicago, County of Cook |
| State and Zip Code | Illinois 60611 |
| Telephone Number | 815-212-3133 and 312-893-2952 and 773-675-8234 |
| E-mail Address | mzamudio@wbez.org |

*Defendant No. 3*

|   |   |
|---|---|
| Name | Alex Keefe |
| Job Title | Political Editor for WBEZ Chicago |
| Street Address | Chicago Public Media, 848 E. Grand Ave., Navy Pier |
| City and County | City of Chicago, County of Cook |
| State and Zip Code | Illinois 60611 |
| Telephone Number | 312-948-4600 |
| E-mail Address | akeefe@wbez.org |

*Defendant No. 4*

|   |   |
|---|---|
| Name | WBEZ, aka Chicago Public Media, Inc. |
| Job Title | c/o Cynthia Photos Abbott, VP & General Counsel |
| Street Address | Chicago Public Media, 848 E. Grand Ave., Navy Pier |
| City and County | City of Chicago, County of Cook |
| State and Zip Code | Illinois 60611 |
| Telephone Number | 312-948-4612 (P) and 847-334-7131 © |
| E-mail Address | cabbott@chicagopublicmedia.org |

## II. Basis for Jurisdiction

The U.S. District Court for the Northern District of IL, E. Division has jurisdiction in this case based on diversity of citizenship under 28 U.S.C. §1332. The amount in controversy is more than $75,000.

1. The **Plaintiff**, Leah Levinger, is a citizen of the State of Connecticut.

2. The **Defendants** are citizens of the State of Illinois.
    Defendant Number 1, Claudia Morell, is a citizen of the State of Illinois.

2

>Defendant Number 2, Maria Zamudio, is a citizen of the State of Illinois.
>Defendant Number 3, Alex Keefe, is a citizen of the State of Illinois.
>Defendant Number 4, WBEZ or Chicago Public Media, Inc., is incorporated under the laws of the State of Illinois and has its principal place of business in the State of Illinois.

3. The **Amount in Controversy:** The amount in controversy is more than $75,000, not counting interest and costs of the court. Plaintiff seeks a jury trial and requests compensatory and punitive damages totaling $325,000 for the harm caused by defendants' malicious and reckless libel.

### III. Statement of Claim

**A. Summary of causes of action under *740 ILCS 145*- the IL Slander and Libel Act**

This complaint responds to libel published by defendants, two reporters supervised by a political editor, who were acting as agents of WBEZ/ Chicago Public Media, Inc. Defendants' libelous statements included both manifestly false claims, as well as statements and omissions in their published reporting that cast plaintiff in a profoundly false light, in violation of the requirements of *740 ILCS 145*- **the Slander and Libel Act**.

Defendants published an article falsely accusing plaintiff of commission of several literal crimes as well as making accusations of a very serious nature alleging plaintiff lacked professional ethics, integrity, and professional competence. Altogether, Defendants false claims severely damaged the professional and personal reputation of plaintiff, which had been without blemish for over 15 years of work in her field as a community advocate, organizer, and expert on affordable housing issues.

3

**1. First cause of action under *740 ILCS 145*:** First, defendant's article[1] falsely conflated the actions taken by independent and discrete individuals--- who governed and manned an independent and discrete community organization from plaintiff's organization--- with actions of plaintiff. In statements conflating plaintiff with third party associates that plaintiff had provided assistance to (during the course of an organizing campaign to save an affordable housing development from extinction), defendants made untrue statements about plaintiff's own actions and the actions of plaintiff's actual organization. While plaintiff was associated through her community work with the third parties whom defendants then proceeded to misrepresent, plaintiff was certainly not identical to them, nor could their actions be said to be her actions.

**2. Second cause of action under *740 ILCS 145*:** Second, defendant's libelous article then proceeded to present the actions of these third parties in a knowingly false light in two ways, while conflating the actions of these third parties, so misrepresented, with the actions of plaintiff.

    (a) Defendants grievously mischaracterized the motives and the context in which the third parties' choices arose, and omitted critical information known and previously extensively documented to defendants about crises to which the third parties were attempting to respond through their civic engagement organizing efforts.

    (b) Defendants also failed to either check or report on noteworthy and journalistically necessary questions of credibility, evidence, motive, and in some cases obvious sources of bias of complainants who had accused these third parties of misconduct.

---

[1] https://www.wbez.org/stories/housing-advocate-in-vote-buying-probe-pushes-affordable-housing-overhaul/5ad06b61-89a2-4ed1-8ad7-fa6cffd9f958

Instead of taking responsibility for the basic *Journalism 101* process of fact-checking, reporting sources, and acknowledging where sources might have cause for bias, the defendants elected to parrot unsubstantiated allegations by parties well-known within the community to have credibility deficits and obvious within the context to have ulterior motives.

Defendants' profound and knowing mischaracterization of the third party associates of plaintiff proceeded in the article on pace as defendants conflated the actions of these third parties—now so maligned and misrepresented--- with the actions of plaintiff. Notably, by conflating these third party associates of plaintiff's, *with* plaintiff, and then presenting the actions of these third parties in a profoundly false light, defendants succeeded in presenting plaintiff herself in a profoundly false light.

**3. Third cause of action under *740 ILCS 145*:** Finally, defendants proceeded to cast plaintiff herself in a false light, and cast the organization plaintiff had spent the prior decade of her life founding and building from nothing into something, by alleging baselessly and ludicrously that her and her organization's work to pass an ordinance to improve access to affordable housing in Chicago was the outgrowth of some kind of criminal plot orchestrated by plaintiff and the organization plaintiff had founded and directed for the prior decade.

**B. Defendants' representations of plaintiff were defamatory *per se***

Defendants' representations of Plaintiff were defamatory *per se*, insofar as they falsely charged plaintiff with commission of a crime, alleged that plaintiff lacked integrity to perform her job duties, and imputed to plaintiff a want of ability and ethical care in her profession. Plaintiff asserts that

5

defendant Zamudio cultivated such false reporting out of actual malice or such a reckless disregard for the standards of truth and balance in reporting that her representations were tantamount to malice. Defendants Morell and Keefe, in turn, published false statements and presented plaintiff and plaintiff's organization in a false light in reckless disregard of the truth and in ill-investigated reliance on Zamudio's misrepresentations, calculated omissions, and unsubstantiated, paranoiac or maliciously motivated theories. It is unlikely that defendants truly believed that the allegations they were publishing about plaintiff were true, but even if they did, defendants "lacked reasonable grounds for that belief." *Trotman v. Wood*, 62 Ill. 2d 1984, 299 (1975).

## C. Additional supporting details about Plaintiff's claim and causes of action

WBEZ Reporters Claudia Morell and Maria Zamudio collaborated on a story edited by political editor Alex Keefe and published by WBEZ on or about December 11, 2019 which contained manifestly false statements, as well as claims and statements that presented plaintiff in a false light[2]. Their reporting published false and misleading statements in reckless disregard of the truth. Their article, "Housing Advocate in Vote-Buying Probe Pushes Affordable Housing Overhaul," alleged that plaintiff carried out a scheme to bribe voters in the 25th ward to vote for a particular aldermanic candidate in the 2019 city elections in exchange for voters' receipt of a gift card. The article went on to imply that-- in exchange-- the Aldermanic candidate who putatively received this illegal support became the sponsor for an ordinance to promote the creation of more affordable housing in Chicago.

**1. Manifest Error and Falsehoods (Elaboration on 1st cause of action)-** *Defendants conflated acts of third parties to whom plaintiff had provided assistance with acts of plaintiff herself*

---

[2] See Attachment 1: WBEZ Full Story: "Housing Advocate in Vote-Buying Probe Pushes Affordable Housing Overhaul"

WBEZ's 12/11/19 article about Levinger contained manifest errors, including the allegation that Gift Cards were given out to residents of Barbara Jean Wright Courts by Levinger or Levinger's organization. Neither Levinger nor Levinger's organization distributed gift cards at this location.

**2. False light presentation of associated third-parties, while conflating their acts with plaintiff's (Elaboration on 2nd cause of action)**

Reporter Maria Zamudio had conducted personal interviews with residents of Barbara Jean Wright Courts, the maligned community, the prior winter and spring of 2019 after one political candidate running for the office of Alderman of one of the wards in which the development sat, accused another political candidate running for the same office of engaging in "vote-buying" at Barbara Jean Wright Courts during a crowded and heated aldermanic race in which much mud was slung, especially as the race headed into a run-off. Following the accusations made by this political candidate, Reporter Zamudio had interviewed several residents at the Barbara Jean Wright Courts (BJW) community, a 272-unit subsidized and rent-regulated housing development comprised of roughly 28 low-rise and townhouse buildings, and occupied by severely indigent African American families and seniors. Zamudio interviewed residents to understand why they had decided to organize a civic engagement initiative and to distribute gift cards to any resident of the complex who lived in either the 11th ward or the 25th ward on election day in exchange for residents' contact information. Zamudio also investigated whether there was anything to the allegations of "vote-buying" that one political candidate claimed against another, despite the fact that the tenant council had, upon clarifying guidance from the Board of Elections, not required anyone to either vote or register to vote in order to receive a gift card. Zamudio was aware the tenant council had required only that tenants provide their contact information to the council and take a flyer about upcoming building meetings and causes.

7

***(a) Defendants grievously mischaracterized the motives and context in which the third parties' organizing drive arose, and the crises to which it was responding--- knowingly misrepresenting a desperate effort aiming only towards community survival instead as a plot of criminal corruption:***

Reporter Zamudio also learned, during the course of the interviews, about the kinds of struggles and hardships facing families and seniors at the Barbara Jean Wright Community: The community was, at the time, grappling with several urgent threats and hardships, and had begun a renewed organizing drive through their long-standing tenant council two years prior to attempt to address current crises. This complaint asserts as facts and evidence that WBEZ reporter Zamudio had been apprised by tenants at the Barbara Jean Wright Community with whom she conducted interviews-- and had been provided with documentation--- of the seriousness of tenants' struggles. Zamudio maliciously or recklessly withheld these facts from any mention within the story published by WBEZ. Tenants had provided the following facts in interviews conducted by Zamudio regarding struggles they faced, which included:

1. Consistently deteriorating conditions at the property, including hazardous and pervasive mold resulting in the hospitalization of both adults and children due to problematic indoor air quality; Crumbling floors and ceilings which resulted in broken bones and other injuries to numerous residents; Testing for radon, the results of which were never shared with residents, in a context in which several young and previously healthy men who lived in the community and had grown up in the community had died in their prime due to a mysterious unidentified wasting disease; and a series of fires due to faulty wiring and outdated appliances during the course of the immediately preceding winter, culminating in an exploding water heater and fire that had recently nearly killed six children in the development in January, 2019, just a month before the community engagement initiative.
2. The Department of Housing and Urban Development (HUD), the government agency responsible for monitoring physical conditions at the development, had violated its own rules and regulations, failing to inspect the property a single time during the prior five years, despite the fact that inspections are required under federal law every 1-3 years.
3. HUD had refused to meet with tenants in the community and their elected representatives despite repeated verbal and written requests for the prior five years.
4. The head of HUD, ultimately responsible for overseeing the Agency's enforcement of HUD standards regarding the development's conditions, was the former co-owner of the development and had been the business partner for over 20 years of the project's owner.

8

5. Both Aldermen for the development's 11th ward and 25th ward portions had consistently ignored requests to meet with the community's tenant council, despite receiving repeated documentation about mismanagement & dangerous conditions threatening health & safety
6. Residents were faced with retaliatory evictions by management in response to organizing.
7. The entire Barbara Jean Wright Courts development was being sold to an undisclosed for-profit corporation at the time of the organizing drive and tenants had no idea who the buyer was or if the buyer intended to demolish the development or convert it to market-rate rent. Residents reasonably feared that 270 vulnerable households would be displaced due to a pending sale about which they could get no clear answers about from any elected or appointed official responsible for coming to their aid or defense.
8. The community had previously been subjected to a racially-motivated gerrymander in the redistricting following the 2000 Census, which split the development across two municipal wards, further isolating its African American populace into a tiny minority treated as politically and socially irrelevant in both electoral districts. BJW Courts residents were ignored by representatives of both the 11th ward, comprised mainly of white voters, and of the 25th ward, comprised mainly of Latino and White voters. This gerrymander splitting the community into even smaller slices, reducing the community's ability to effectively advocate for itself. Its marginalization had been demonstrated to tenants by the intervening two decades of neglect, which presented increasingly life-threatening risks to both individual residents and to the community's existence as a whole.

Plaintiff had provided technical and organizing assistance to the Barbara Jean Wright Courts Tenant Council and its membership actively since the fall of 2017 regarding the issues enumerated above. Plaintiff's concern about BJW Courts was based on experience over the prior 15 years as a tenant organizer watching communities who faced similar sets of objective risk factors, who had been wiped off the map as a result of those risk factors. Plaintiff feared for the future of this community.

Reporter Zamudio had received documentation and testimony from BJW tenants about each of these risk factors. In the winter and spring of 2019, reporter Zamudio had personally interviewed BJW residents who had communicated with her over hours of interviews about the fires, hospitalizations due to substandard development conditions, retaliatory evictions, and fear of displacement. Despite Reporter Zamudio's awareness of these concerns, and hundreds of pages of backup documentation validating these concerns, WBEZ included no information in its 12/19/19 article regarding the threats facing BJW Courts residents, out of which their organizing drive had grown. Instead, defendants

maliciously or recklessly misconstrued the Barbara Jean Wright Courts community's honest efforts- to raise participation in their tenant council and build the community's capacity as a constituency situated on unsympathetic terrain- as some kind of gross and criminal political scandal perpetrated by plaintiff. The reporters thereby erased the human struggles of this community and its homegrown leaders who were navigating difficult and increasingly imminent collective survival challenges. Defendants instead represented the tenant body as agency-less chits for trading in a conspiracy of alleged political corruption and felony vote-buying, which the reporters further alleged was carried out by "Levinger" and "Levinger's organization". Defendants knew that the true story of this community was not the hackneyed story of a corrupt "Chicago political machine" they chose to tell.

### *b. Defendants maliciously or recklessly failed to make any investigation of the credibility of whoever made the allegations against the third-party associates they conflated with plaintiff*

Equally troubling is that defendants appear to have conducted little to no investigation into the credibility of the unnamed individual whose allegations about "vote-buying" defendants parroted without citation or sourcing. Instead, fully 10 months after the allegations were made by an equally unnamed and uninvestigated source, and with *no new evidence or information* to report---- defendants published anew *as if* "news" an unsubstantiated claim by an unnamed person against the third-party associates of plaintiffs, while mis-placing the claim as if it had been made against plaintiff herself and against plaintiff's own organization. There is no evidence that defendants conducted a modicum of research into the credibility, character, or mental health of whoever their unnamed, uncited complainant was. Yet upon the unquoted, uncited testimony of this unnamed mystery source, defendants proceeded to base a substantial 'hit piece' directed against plaintiff. Around this sole unvetted complainant, defendants proceeded to spin an increasingly implausible and labored story of the allegedly expansive criminal reach of plaintiff's allegedly criminally corrosive influence. Nor did

10

defendants explore or appropriately reference in their reporting the possibility—- obvious to any thinking person--- that the aldermanic candidate who had organized a press conference 10-months' prior to scrimmage up publicity around these murky allegations about "vote-buying" against his political opponent might have a self-serving motive of his own related to his political ambitions, which could *ostensibly* tend to produce bias. This is *Journalism 101* fact-checking, and it failed to happen at all levels of defendant WBEZ's chain of command.

Instead, with not a shred of substantial evidence, and with no new information, the defendants republished allegations of an unnamed source with unnamed and uninvestigated motives after fully 10 months' of said allegations sitting stale. A journalist might ask, in what sense could unsubstantiated allegations, 10 months cold at the time of the 12/11/19 story, be contrived as *news*? Defendants recycled the allegations, as flimsy in December of 2019 as they had been the previous February, in the context of a totally unrelated Subject Matter Hearing regarding a totally unrelated affordable housing ordinance developed by a totally independent citywide housing rights umbrella coalition comprised of 11 totally independent organizations, the Chicago Housing Initiative, with a totally discrete governance body, totally discrete membership, and totally independent legal status.

Defendant's 12/11/19 publication gave highly visible, primetime stage to gratuitous gossip soon formally dismissed as baseless by the Attorney General in the course of due investigation, who within three months of the WBEZ story, had closed their investigation into the alleged "vote buying" with no findings and no charges.

### 3. False Light Portrayal of Plaintiff and Plaintiff's Organization (Elaboration on 3rd Cause of Action)

In defendants' December 11th, 2019 article, the reporters adduced a purported motive for the purported felonious vote-buying scheme they claimed that "Levinger and Levinger's organization"

11

had carried close to a year prior. The motive they assert behind the political conspiracy they allege was ostensibly to get an affordable housing Ordinance introduced to the Chicago City Council.

Here again, the article contains both gross misrepresentations and inexcusable omissions that together present the plaintiff in a profoundly false light, as someone with no civic integrity, whose work at both the community and citywide levels exerted a putatively corrupting influence on the democratic process, whose motives were impure and whose conduct was literally criminal. The Ordinance cited in the WBEZ article- the *Development for All* Ordinance- was the subject of a City Council Subject Matter Hearing in the City Council Committee on Housing and Real Estate on December 11, 2019, the date defendants published their hit piece. This Ordinance had been developed by plaintiff's organization, the Chicago Housing Initiative (CHI), a citywide coalition slowly growing from a tiny handful of people over a decade of assiduous effort on the part of plaintiff into a robust citywide network of 11 multi-issue community-based organizations and popular base of thousands across all sides of Chicago at the time of defendants' malignant publication. This Ordinance had received the endorsement of over 40 community groups and labor unions prior to its re-introduction in July, 2019, and was the product of 5 years of discussion, research, and community meetings across countless poor people's organizations regarding how to respond to Chicago's affordable housing crisis.

In its 12/19/19 article, defendants seem to imply that the subsequent introduction of this Ordinance was either the purpose or somehow the outcome of the prior "vote-buying scheme" they allege. Defendants conveniently failed to mention that this exact Ordinance had first been introduced under the same name and with the same content in the previous City Council session in 2018, by a sizable team of Aldermen led by Alderwoman Susan Sadlowski Garza, Alderman John Arena, Alderman Chris Taliaferro, and Alderwoman Deb Mell. When the prior City Council session closed due to the

12

intervening 2019 elections, all Ordinances introduced during the 2014-2018 term which were still pending (e.g., neither passed nor defeated) were closed-out by a "Sunset Ordinance", as is customary, wiping the slate clean for the new City Council to come in. As a result, it was necessary for the Chicago Housing Initiative Coalition and its allied community groups to re-introduce the Ordinance with a new team of lead sponsors. Two of the prior lead sponsors of the *Development for All* Ordinance, Alderman John Arena and Alderwoman Deb Mell, had been defeated in the elections; and as the prior named lead sponsor Alderwoman Susan Sadlowski Garza had been assigned by Mayor Lightfoot to become Chairwoman of the Committee on Workforce. With her new responsibilities, Chairwoman Garza no longer had the capacity to lead on issues such as affordable housing, which lay beyond the scope of her committee chairmanship on labor matters. Meanwhile, prior lead sponsor Alderman Chris Taliaferro decided to re-introduce another of CHI's affordable housing Ordinances, the *Homes for All* Ordinance, to continue forward that companion piece of legislation.

As a result of these shifts from the prior election, CHI had to organize a new team of active Aldermanic sponsors, and did, assembling a diverse team of 12 Aldermen from different caucuses, communities, and sides of town, to help lead the Ordinance's re-introduction in July, 2019, each of whom had prioritized affordable housing as an issue they would champion. This large team of Aldermen met regularly each month from May through the hearing on the Ordinance in December '19, the day of defendant's unwarranted, out-of-left-field attack on plaintiff's character.

Instead of providing factual history about this Ordinance's long trajectory through City Council, defendants elected the following narrative summary about the policy effort: "Housing Advocate in Vote-Buying Probe Pushes Affordable Housing Overhaul: *Illinois' attorney general probed vote-buying allegations involving the advocate and an alderman.* ***Now they're working together in City***

13

*Hall.*"[3] Defendant conveniently failed to mention the support of 24 additional Aldermen for the Ordinance in addition to the one Alderman they singled out. This omission was journalistically inexcusable. All told, fully 25 Aldermen signed a letter to Mayor Lori Lightfoot and Housing Commissioner Marissa Novara describing their support for the *Development for All* Ordinance and urging the Subject Matter Hearing in question that day, a letter included in the press packet that defendant Morell and all other reporters covering the day's events received[4]. Indeed, defendant Morell herself had personally been live tweeting the morning's press conference which preceded the Hearing in which 12 Aldermen spoke ardently in support of this Ordinance. Every other news outlet covering the Hearing provided information about the broad basis of support across the entire breadth of City Council[5]. Defendants' reporting, in contrast, sat out as a severe and calculated outlier. Defendants were aware that the Ordinance in question was broadly supported by a wide base of City Council members and had extensive evidence of this support. Yet defendants withheld all of this information from the story they published, in order to recast plaintiff's policy work in an untenably false light, as the product of a felonious scheme enacted 10 months prior, that was now bearing fruit in the form of one Alderman's trade of support for earlier alleged "vote-buying." Accurate reporting would have fatally belied the narrative defendants were determined to superimpose. So they omitted.

The theory WBEZ propounds in its 12/11/2019 article about how the political process functions- and how plaintiff purportedly 'manipulated' it- is palpably absurd. Did "Levinger and her organization" also "buy the votes" of the previous lead sponsors Alderwoman Sadlowski-Garza, Alderman Arena, Alderwoman Mell, and Alderman Taliaferro, so as to explain their 2018 and 2019 championship for the *identical* ordinance introduced *two years'* earlier? Did "Levinger and her organization" then

---

[3] See Attachment 1: Libel Case-WBEZ Story-Line
[4] See Attachment 3: Aldermanic Support Letter to Mayor & Housing Commissioner regarding Development for All Ord.
[5] See Attachments 4 and 5 for just two of many examples of other press coverage related to the Ordinance and Hearing

14

<pre>
</pre>

<pre>
</pre>

proceed to "buy the votes" of the *25* Aldermen who signed the support letter for this Ordinance in October, 2019? Perhaps "Levinger and her organization" had even bought the support of the Chicago Tribune! After all, it had run a front-page, 3000 word investigative story the year prior, "<u>Mayor's Affordable Housing Plan Falls Short</u>" about the severe deficiencies in the status quo of the *exact* City affordable housing policy that the *Development for All* Ordinance proposed to course-correct. Indeed, in WBEZ's theory, perhaps "Levinger and her organization" "bought" the support of the Chicago Office of the Inspector General, who had issued a <u>report in March of 2017</u> regarding serious failures of the exact Affordable Requirements Ordinance which CHI and partnering Aldermen sought to substantively amend. After all, there's nothing like bribery to get the inspector general to raise concerns about a City's catastrophic failure to follow federally obligatory fair housing law! It is a sad testimony on the state of our democracy when the default assumption in media becomes: What else could explain political activism on an issue, but that tawdry vote-buying is occurring somewhere, in some form, by someone in our tainted society. *Is this now the only world we know how to see?*

The theory about the existence of such a political conspiracy is palpably absurd, as is the assertion about the purported motives for it by the broad and diverse set of literally hundreds of humans who are donating their evenings and weekends in an effort to try to make Chicago better than its history. Perhaps it is motive enough that if we do not improve Chicago's affordable housing landscape there are thousands of families, seniors, and children who literally will not survive in this City without this change. Defendants Morell and Zamudio knew better than the quack story they spun, as any respectable, experienced, and serious journalists would know better. Political Editor Alex Keefe fares no better in this postmortem autopsy of reckless reporting: His failure to safeguard appropriate standards of duly responsible investigation--- such as the responsibility of checking the credibility of sources and *sharing enough context such that the human story is revealed rather than obscured---*

15

was equally a dereliction of professional duty. Keefe was responsible for ensuring fact-and-source checking within the news org's chain of command. He failed to do so. The cost has been high.

Simply stated, defendant's December 11th, 2019 reporting was a "hit piece" targeting plaintiff in ways that have ended plaintiff's 15 year career in public service and have broken plaintiff's heart. Defendant's reporting was ill-researched, context-less, profoundly slanted, grossly misleading, defamatory in content and defamatory in intent. The most charitable interpretation that can be made about defendants' reporting that day is that the defendants operationalized a de facto understanding that they were not *pragmatically obligated* to exercise the same standard of journalistic deliberation, care, and integrity they would have demanded of themselves before they would have dared to make equivalently serious allegations against individuals with money or clout. Defendants operated from a sloppy complacency knowing they could publish false, misleading, incomplete and distorted information about community organizers, community organizations, and poor people with impunity because *these people* lack the financial resources and capacity to fight back. Why go to the trouble of making proper, responsible investigation and engaging in due process fact-checking? After all, when the person you are so casually destroying has no resource, they have no recourse. It's open season.

While WBEZ is a media organization enjoying special first amendment protections *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), knowingly false statements and false statements made with reckless disregard of the truth do not enjoy constitutional protection *Garrison v. Louisiana*, 379 U.S. 64 (1964). A reckless lack of attention to the truth--- or a malicious withholding of it--- that misleads or deceives others- in this case via widespread publication- is defamation and libel, plain and simple.

### IV. Relief
#### A. Harm suffered by plaintiff due to defendants' libel

Defendants' allegations that plaintiff committed felony crimes of vote-buying and masterminded an extensive criminal political plot to trade votes for support for an affordable housing ordinance are defamatory *per se*. As a result of defendant's false statements and false light portrayal, plaintiff suffered job and economic loss, mental suffering, personal humiliation, impairment of personal and professional reputation and standing across a broad cross-section of professionals in community organizing, policy, advocacy, government, and philanthropy, all of whom had come to know and respect plaintiff's work over the past fifteen years of assiduous, consistent, persistent, loyal, and heartfelt effort on behalf of Chicago's poorest people. Ultimately, defendants' story ended plaintiff's employment with the Chicago Housing Initiative--- an organization she herself had founded ten years prior and built from nothing but a logo into a notable citywide organizing coalition widely respected by a broad cross-section of Chicago's leaders in advocacy, politics, policy, and philanthropy. It also ended plaintiff's 15-year career in Chicago as a community organizer and highly respected affordable housing policy expert. Plaintiff no longer works in this field and no longer lives in this state. While it takes years to build credibility, trust, and respect, it takes only a single allegation published in a highly visible manner by an ostensibly credible news source to dismantle all of the above.

### B. Relief Plaintiff Seeks from the Court

**Legal relief:** Plaintiff requests a jury trial and seeks legal remedies in the form of compensatory damages for the economic, professional, and reputational harm and for mental suffering, anguish, anxiety, and humiliation she suffered in the amount of $225,000. Plaintiff seeks punitive damages in the amount of $100,000.

**Equitable relief:** Plaintiff also now seeks to rebuild her life as a person of integrity, which she is. Towards that end, in addition to damages, Plaintiff requests the Court grant equitable relief by

17

requiring WBEZ and other defendants to remove the 12/11/19 Article from all of their online platforms. Plaintiff further seeks that the court enter a judgment to the effect that, as unsubstantiated malicious *libel*- this article shall remain under permanent Court Order that it cannot be re-published or referenced by any source as credible news in any medium (print, radio, TV, or online).

**Temporary Injunction:** While jury trial is pending, plaintiff requests a temporary injunction from the Court requiring WBEZ to immediately remove the 12/11/19 article from its platforms, to limit further unjustified reputational harm and suffering to Plaintiff, pending the outcome of the jury trial. **Defendants' article was false and wrong when it was published. It is false and wrong now.**

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 12/9/2020
Signature of Plaintiff: *Leah Levinger*
Printed name of Plaintiff     Leah Levinger

18